23, I guess, dash 2636 Hawks versus PNC Financial Services. Take your time and whenever you're settled in and ready, we'll hear from Mr. Schwartz Fennick. I just want to, I'm a lot shorter than them, so I just want to, are you able to hear me okay? Okay, I didn't know if I needed to adjust six and a little person. Okay, may it please the court, my name is Sam Schwartz Fennick, and I'm representing defendants' appellants, and I request to reserve five minutes of rebuttal time. So as an overview, this case involves a claim for long-term disability benefits. The claim is reviewed under the abuse of discretion standard. The district court ruled for appellee Ms. Hawks and against my clients on cross motions for summary judgment. As we detail in the briefs, Ms. Hawks received benefits under the long-term disability plan for nearly two years while she recovered from an ankle injury. Her condition improved, and at that point, and it's acknowledged by both Ms. Hawks and her doctors, and then as affirmed by multiple medical and vocational reviewers by the claims administrator Lincoln, she no longer met the definition of disability due to this improvement. So when Lincoln ultimately terminated benefits in January of 2020, it did so after a thorough and full review of the record and based on her current medical condition. As this decision was reasonable, and thus not an abuse of discretion, appellants ask that this court reverse the district court's order as the evidence in the administrative record makes clear that Lincoln's decision was reasonable. Where did the district court go wrong in your view? I think the district court went wrong in a number of areas. When you read the district court's decision, it's not focused on Ms. Hawks' condition at the time of termination. At the time of termination, Lincoln was looking at the most recent medical records from Ms. Hawks' doctor. She had an orthopedic surgeon, Dr. Lewis, and she also had a primary care physician. The latest medical records they submitted were November of 2019, and in those records both noted significant improvement, neither restricted her from work. And this is in sharp contrast to Dr. Lewis' prior medical reviews of Ms. Hawks, each of which had restricted her from work. Now, at the same time, Ms. Hawks herself noted that she had improved significantly and that her pain had diminished. The court skirted over those and noted that when Dr. Anderson, her primary care physician, for example, said that she had sedentary work, that he couldn't have meant that. That's not the question presented on abuse of discretion standard. That's affirmative fact finding. And here it was more, was it reasonable for Lincoln to look at a doctor who checked sedentary work and to conclude that? Another issue where the court erred is it didn't analyze whether Lincoln's interpretation of the plan definition of disability was reasonable. Here, the plan provides that a claimant, in order to meet the definition of disability, cannot perform their own occupation as it's performed in the national economy. The district court read out the word national economy and only focused on whether plaintiff could perform her own occupation and what level that was. A further problem with that is the district court took issue with Lincoln for not engaging in affirmative fact finding on the capacity level of her own occupation. And that was incorrect because it's Ms. Hawks' burden to provide and present that evidence to Lincoln. And here, both Lincoln and Ms. Hawks' vocational reviewers both agreed that the most analogous job to hers in the national economy was a sedentary position. The court further erred, for instance, by saying that Lincoln never provided Ms. Hawks with a road map of what additional information she could submit in order to prove to meet her burden. That's incorrect. In its claim denial, it actually detailed a number of types of information, including medical records, that she could submit to support her claim. Here, the last medical record she submitted were those records from November of 2019. The district court also didn't limit its review to the record that was before Lincoln. It considered two types of extrinsic evidence. One was an evaluation. It's not really medical records. It's just like a conclusory statement by her primary care physician as to her capacity in 2020. That was submitted on summary judgment. It was never submitted during the administrative review process. There's also a chart that plaintiffs created from some of the national occupation dictionaries that they claimed supports that Ms. Hawks' position was not, in fact, sedentary. Not only was this not before Lincoln when it was reviewing the claim, if you actually dig into what the numbers on these charts actually mean, and we do this in our brief, this chart underscores that in the national economy, her position is sedentary. The court disregarded that Ms. Hawks had said to both her physical therapist and to Lincoln that she considered her own occupation to be sedentary in nature. So at base, Lincoln did a thorough review of the record. It did what it was supposed to do, which is to review and analyze each document it received, and then have its own experts that it hired look at them, and based on that, make a reasoned decision. And we still have, it's an arbitrary and capricious standard, correct? Correct. There's no affiliation between the plan and the two? Correct, yeah. So P&C is the employer, and they fund the benefits, and Lincoln is wholly separate, and their sole function is to analyze and decide claims and interpret plan language. Another point the district court seemed to focus on, and I just wanted to stress, was that it took issue with Lincoln for not distinguishing the award of disability benefits by the Social Security Administration. And I think that putting this case into more of a timeline would help, because when the Social Security Administration decided the claim for benefits, its claim, Lincoln was already affirming and approving benefits. There was no dispute in 2018 that plaintiff was disabled. The question before Lincoln, when it was deciding, when it made its ultimate termination decision, was whether plaintiff was still disabled based on new evidence in late 2019, early 2020. And Lincoln made that point in its appeal denial letter when it said, we had evidence before us that was not before the Social Security Administration. As Lincoln also agreed with plaintiff's two physicians as to, I'm sorry, Ms. Hawk's condition, as to what its limiting capacities were in late 2019, it was also reasonable for Lincoln to not conduct an independent medical examination. I would also note that nothing in the plan requires an independent medical examination to be performed. Thank you. Great. Well, appellants, I'm sorry. And thus, appellants ask that the court reverse the decision of the district court and enter judgment in favor of appellants on all claims. May it please the court, Andrew Gravehorn for Appellee Rhonda Hawks. I'm trying to think of the best place to start here because we have so many moving pieces between the attorney's fees that they've challenged the interest and the long-term disability. I think generally the easiest probably is the long-term disability aspect. And from a factual standpoint, well, opposing counsel and I do get along. We do disagree fundamentally on the facts here. And I believe Magistrate Judge Lena Hambelow got it spot on when she looked at what Dr. Anderson and Dr. Lewis both said. Specifically with Dr. Lewis, he had been consistent throughout the record of saying she could do her activities as tolerated. Sure, he might have thrown in the word job or work function here and there. But he never completed the little boxes that said she could perform sedentary, light, any of the work. And moreover, question five on that form specifically says, if your client cannot or if your patient cannot work, why? And he said, see records, clearly affirming his belief that she cannot work. Well, I think there's a legal issue here, whereas the Magistrate Judge thought, in the district court's opinion, thought that this was about doing her particular job. But there's the language in there about doing in the national economy what the occupation category is, not just her particular job. So, you know, to the extent that the doctors are saying she can't do the one position she was doing right before disability, maybe they said that. But it looks like the district court just read this in a way different from the way that even Van Arzel said you're supposed to read it as a category. At least it is reasonable and not abuse of discretion to read it as a category. Isn't that a legal flaw in the decision below? I would disagree fundamentally with that, Your Honor. And I would point back all the way to the Third Circuit case law, going back to Miller. And what that basically says is that you have to look at what this person is actually doing on a day-to-day. Because under the DOT. It depends on the plain language. I agree with the plain language. But almost every single one of these plans, including Van Arzel and Branca, which were both against Liberty, who was the original administrator of this before they were bought by Lincoln. It's virtually identical to every Liberty or Lincoln policy that I've ever seen. And, Judge Bybus, I believe there was a decision recently that you were on that dealt, I believe it was the McCann decision. And it talked about where the word his and her went before the word own occupation. And here it specifically says your, meaning the insured. We're looking at the insured's occupation. That's the national economy. It can't be limited to hers. That phrase doesn't mean anything if it's limited to the specific job she was doing. And, again, I would say that just like in, I believe it was the, sorry, Blanken here. Your Honor, Judge Rondeau, you recently had a decision along the same lines that talked about this where it does bring up the national economy. And, yeah, it says national economy. I get that. Because every job is not going to be square peg, square hole. Not always going to happen. And that's why in the DOT, by way of example, every job, it's more of a category. Here, by way of example, the manager office, I believe is what the wording was, it has 12 different occupations that fall within that, recognizing the fact that, okay, we've got to go a little further. We've got to go, what's she really doing on a day-to-day basis? And there's a Sixth Circuit case that's largely spot on with this. And that was, the name of the case is Susan Card v. Principal Life. I'm happy to supplement the court with the decision. I can't remember if I cited it in my brief or not. But it came out a couple years ago and dealt with a nurse. And in that situation, they said, okay, DOT would qualify as a nurse under that. And it had the same national economy language in there. But they said, okay, we've got to go a step further still because we've got to look at your occupation. What are you doing on a day-to-day basis? And in that situation, they realized, okay, it's really more of a medium level rather than light duty because she was lifting way more than a normal nurse would. What was the plan language in that case? Again, it was very similar here. Well, but similar could be different. It had the same national economy language that Your Honor is talking about. It could be national economy, comma, giving consideration to. I mean, we really have to look at the plan. Do you agree we have to look at the plan language? I agree that you have to look at the plan language. But also, just like the McCann decision that I was discussing a minute ago, you've got to look at where that wording goes before the part of own occupation. In that case, I believe it said his or her occupation as it is normally performed in the national economy. Here it says your occupation as it's normally performed in the national economy. So I still think that you have to give some credence to what the person's doing on day in, day out. And even if we don't get that far, each of the – We have – I mean, some of those cases involved affirming. This case involves reversing a plan administrator's construction of the language. And it's a very deferential standard the district court was supposed to be applying here, right? So what is it that makes this an abuse of discretion for the court to read this as a category? And, you know, the judge's opinion was like, well, she herself can't do this. But I'm not seeing cases out there that have said that a plan administrator can't read this language this way. And, again, I'd be happy to supplement with some of the more recent ones, Your Honor. But what I will say is that I don't even know that we need to get to that issue. Because everyone in the record, both her TSA and the ones that Lincoln relied upon or PNC relied upon here, said that this is either – it's between sedentary and light. There are definitely some light aspects to it, which there is not a doctor that she has that says she can do light-duty work. So I don't even think we need to get to that. Because, clearly, if she can't do light-duty, then she can't do her own job. And that would – We don't need to get to that because everything points in to sedentary in the national economy. So I think we need to get to that. The way that – so one of the cases we cited, too, I believe it was Herbert, and then there's also a Morrison v. PNC case that comes directly out of the – I think it's New Jersey. No, it's out of Pennsylvania. Because these PNC policies, they have a venue permission, so it's definitely out of Pennsylvania. But a district court talked about the same type of occupation as did the one in Eastern District, Kentucky, that we cited in our briefing. And they said that, yeah, it used to be medium to light, but then the DOT changed it to be sedentary to light. And the reason it's changing is because if you actually go look at the DOT where it says sedentary on its website, that was last updated in 1988. Personally, I wasn't even born yet. So a lot has changed over the time in just what anybody does from a standpoint of what your day-to-day duties are as companies add more and more for each person to do. So I would say that no matter what, at minimum, it's sedentary to light-duty, which require her to have light abilities, which Dr. Anderson and Dr. Lewis, no one ever said she could do. But, again, I'm happy, like I said, because this national economy language comes up all the time. And it was in Bronca, and it was in Van Arsdale, which still say, yeah, we go look at the national economy generally, but because the DOT and everything is so outdated, we still got to give some credence to what these people are doing on an actual day-to-day. One of the examples that comes up a lot is generally, say, some attorneys, we might not necessarily have to travel a lot. Fortunately, I had to travel here today, fortunately, I should say. But not all of us do. So you got to go look at that specific attorney. Okay, does he have to travel a lot? No. Okay, it's probably more of a sedentary occupation. Okay, this attorney, yeah, this is how it's normally performed in the national economy, but on his own occupation. Does he have to travel across the country? Because I generally jump something immediately to lighten the medium. But I think the more general problem is you're using the word occupation like it's synonymous with job. I think the way that the administrator read it is, if we had said her job, then we'd be focusing on just what she did. But occupation is more like a genus, a higher-level category. I don't understand that you are leaving any room for a difference between an occupation and a job in your reading. It kind of goes in, you'll see it in the chart that I put in both below and up here. I distinguish it between occupational categories and occupational titles. It's all an occupation. A job is just a subsect of that. But I would refer to his job as more of your occupational title, what you are. Just like I gave you the example of a nurse earlier. Okay, there's a registered nurse. Below that occupational category, there might be the occupational title of a charge nurse or a different type of pediatric nurse. There's different elements that go under that, and that's why the DOT, like I noted, has 12 different ones that fall under this manager office or officer manager. I can't remember exactly which way it goes. And the reason we have to look at that even more is because that's not what her job title was. She was the banking operations something. Sorry, name slipped out of my head talking about national economy too much. So I would respectfully disagree with it. It is taken into consideration, but at the same time we actually have to look at what this person is doing day in and day out to give any sort of credence to own occupation as a general person would understand it. Further, I believe opposing counsel made the comment that they're entitled to deference for how they interpreted the words. Unfortunately, that argument is nowhere in the court below. It was not raised to the lower court judge. They simply focused on the national economy argument that's phrased here. Now, one of the things that I did hear and I believe was talked about, and I want to make sure I address, is what evidence the court considered that she wasn't supposed to consider. And the two are Dr. Anderson's opinion from I believe it was August 2020. That one's easily dealt with because Mr. Proctor and his TSA specifically referenced it and largely quoted exactly what it said. So they knew it was there. That information's clearly in the record. But that's hearsay. It is hearsay. However, they also had their own TSA who recognized the same and accepted what Dr. Proctor said. And with due respect, Arissa, we're so used to hearsay because the administrative record is what the administrative record is and we can't control it much. However, what a lot of the cases have focused on, and there's a great case called Greer out of the Southern District of Mississippi that brought in a case from the Fifth Circuit called Crosby, and it's why we're allowed to get this in. It's for completeness of the administrative record. Under Arissa, we're supposed to have a meaningful dialogue between plaintiff, defendant, insured, insurer. And when you know this evidence exists because their TSA guy, TSA vocational person, I believe it was Mr. Miller on that one, he specifically recognized that this document's out there. He cited to it in his opinion. Yet Lincoln didn't say, hey, Ms. Hawkes, do you have this? Can we get it from you? That's what we need. We'll take a little bit more time because, trust me, these insurers have no issue taking additional time to make a decision. He could have said, hey, we're going to pause this for 30 days, and if you'll go get that opinion for us, we'll absolutely consider it. They knew it was there but didn't ask. Well, whose obligation was it? I would say that it falls on both sides because that goes to the meaningful dialogue. As a plaintiff, a general layperson, they're not going to know, oh, hey, I need to go get X, which is exactly why the claim regulations require that when you're going to deny a person's or terminate their benefits in this case, you have to tell them exactly what you need to approve their claim. And not just that, but explain why you need it. And in here, the termination letter is scanned. It is, from doing this a lot, it is the exact boilerplate language that I see in every single Liberty or Lincoln letter. And going one step further, talking about the termination letter just one quickly, her Social Security determination is not mentioned anywhere in there. In their reply brief, I believe it is, PNC makes a big deal that when she was approved in March of 2019 on application, mind you, which does not happen for anyone that's familiar with Social Security, but when she was approved, there was a little note in there that said, hey, we're not sure what's going to happen in a year, so we're going to review you again in March 2020. She's still getting SSDI benefits to this day. They knew that. And even though they had all the authorizations, even though they could have said, Ms. Hawks, hey, will you go get your Social Security file? That's one thing we need. Didn't do anything. When a general person is going to sit there and give you the authorization to say, hey, here, go get my medical records. Whatever you need, you can get it. They expect the insurance company to do it. And again, it goes back to the meaningful dialogue that never occurred. The second piece of evidence that I believe we talked about the most was the O-Net chart that I put in there. I kind of take a little issue with saying that that's outside of the administrative record because if you're going to rely on O-Net and or DOT, one would assume that you're going to go look at what these occupations actually require, and that is publicly available, which I believe I cited directly to O-Net for that. So I would say that that is absolutely in the administrative record where it should have been because they say they considered it. So again, we dispute what Dr. Lewis said. We believe that he fully supported her, just as Dr. Linehan noted. He never checked the box saying that she could do anything. Even when Dr. Anderson did check the sedentary box, as Dr. Linehan noted, and it's common, these things never say none at the top for you to check. Why? I feel we all know. And then secondly, as Judge Linehan noted, it also didn't have a place for it to say partial. It was just all or none. And even so, just like Dr. Lewis on the question five box, it says, if your patient cannot work, why? And he completed that part. He, again, then obviously affirmed his opinion by doing the August 2021. However, what I will note on him is going back to the meaningful dialogue and doing what's easy, doing what's right there for you. Lincoln just refused to call him. The reviewer that they relied upon to terminate the benefits said, yeah, I don't need to call him, record's clear. Well, no, it's not clear because one, Dr. Lewis, which box did he check? What did he mean? Call. Dr. Anderson, is this what he meant? Because it conflicts with this and this potentially. Call him. So with that said, if I might wrap up real quick. Thank you, Mr. Graff. Okay. Mr. Schwartz-Fenwick, you have a few minutes for a bubble. Thank you so much, Your Honors. So I want to just make a few points. The first, opposing counsel, he referenced that we didn't cite in our brief any reference to, under the abuse of discretion standard, but also pertaining to interpretation of language. I would direct the court to the Fleischer case that we note, and I can provide the full. Let me see. All right. Well, I'm looking for that full cite because I know my time is limited. I also just wanted. It is, yeah. It's 679 F3rd 116. I also, there was mention of, a lot of mention of Dr. Lewis and what he concluded or what he didn't conclude in statements that he continued to say she couldn't work. And we detailed this in our brief, but in every prior record of Dr. Lewis's that Ms. Hawkes had submitted, he expressly said cannot work. He stated a specific duration of time, and then he scheduled a follow-up appointment. In November of 2019, he didn't do that, and he didn't schedule a follow-up appointment, and Ms. Hawkes never submitted any additional records that she ever saw him again or ever had any treatment for her ankle. I would disagree with Mr. Grabhorn. Lincoln, in fact, did make attempts to call both Dr. Lewis and her primary care physician, Dr. Anderson. Neither called them back. Is that in the record? It is. And they were never called back. Plaintiff, or I'm sorry, opposing counsel also made the statement that somehow the dictionary of occupational titles in ONET are outdated, and that's been recognized by courts. That's news to me. These are the gold standards for interpreting how an economy, to find the most analogous job in the national economy. They are a consistent standard, and they're regularly updated. And because they're regularly updated, that was one of the issues we had with the chart that opposing counsel submitted in his brief. Because it was an undated reference to ONET, it wasn't clear when he had pulled this data and if it even was the data that would have been on that site during the claim review process. Now, Your Honor, you mentioned the Van Erstel case. I just did want to go into that case in a little bit of detail because it's our view that it supports what Lincoln did here in Van Erstel. It was taken as a given that when you have this national economy standard, what you're supposed to do is look at the specific job functions of a claimant and then find the most analogous occupation to that in the national economy. The problem in Van Erstel is the parties disagreed as to what was the most analogous job title. Here, there was no disagreement. Mr. Proctor, the vocational reviewer for Ms. Hawkes, agreed with Lincoln. What Mr. Proctor then did is said, yes, this is a sedentary occupation in the national economy, but as applied to plaintiff, it's light duty because her job had light duty functions. He gave some credence to the national economy standard and then he erased it. That's improper and it's not what the plan provides and it certainly doesn't make it unreasonable for Lincoln to actually abide by the terms of the plan and find the most analogous job in the national economy. Opposing counsel was repeatedly talking about this notion that there's a back and forth and it's unclear whose responsibility it is to provide information. That's not true. It's plaintiff's burden to demonstrate disability. That means that to the extent Ms. Hawkes, who was represented by counsel, disagreed with any of the conclusions of Lincoln, the burden was on Ms. Hawkes to supplement the record by providing any of the indicia of supplementation to prove her case that Lincoln laid out for her in its denial letter. You know, it would have been an easy point here if Lincoln is saying the latest records you submitted were from November of 2019 and now she's appealing in July of 2020. Submit updated records. She did not do that. I see that my time is up. Thank you so much, Your Honors. We thank both parties. We'll go off the record for a moment to Greek counsel at sidebar.